UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

HILBERTO RAMOS,

               Petitioner,

- against -

W. PHILLIPS, Superintendent,

               Respondent.

------------------------------------------------------------X

**MEMORANDUM AND ORDER**

1:04-cv-1472-ENV

VITALIANO, D.J.

## BACKGROUND

In 1997, petitioner Hilberto Ramos ("petitioner") was convicted of the July 18, 1996 murder of his 19 year-old girlfriend, who had been slashed with a box cutter, stabbed, choked, shot five times, dragged up a flight of steps, and left dead in her parents' bathtub.

At trial, the evidence of petitioner's guilt was overwhelming. In the 36 hours following the murder, petitioner told police a progression of conflicting tales, but he eventually confessed when he was confronted with clear evidence of his guilt. Initially, when asked where he was during the early morning hours of July 18, 1996, petitioner told police that he had spent the night with a co-worker. When the co-worker denied this, petitioner told police that he had actually spent the night at a hotel with his other girlfriend, 16 year-old Pao Tung ("Tung"). When hotel security videos revealed that petitioner had checked into the hotel alone at 5:08 a.m. and checked out at 6:05 a.m. wearing different clothes, petitioner again changed his story, indicating that he had actually spent the night dealing drugs in Washington Square Park with Tung. In response to

further police inquiry, petitioner, who had waived his <u>Miranda</u> right to have an attorney present during questioning, gave yet another account in which he admitted visiting the victim's home at about 2:30 or 3:00 a.m. on the morning of July 18,[1] at which time she was already in the bathtub and near death. Following his grizzly discovery, petitioner said he nervously ran from the scene so quickly that he tore his pants on the front gate. Rather than go to his own home, petitioner then traveled, in the middle of the night, to Tung's home to obtain clean clothes because the clothing he was wearing was ripped and sweaty. According to this account, despite his innocence, petitioner then took a cab to a hotel, quickly changed into the clean clothes supplied by Tung, checked out, and threw the knapsack containing his old clothes into a garbage truck. Furthermore, petitioner's account suggested that the victim, though being shot five times in the chest and neck, was still alive when he arrived at her house, but, inexplicably, he decided not to call for help.

After giving this fantastic, yet highly inculpatory, account of events to police, petitioner was again questioned by another detective who confronted him with the statement of his girlfriend, Pao Tung, who had confirmed that petitioner had shown up at her house at 4:30 a.m., asking for a change of clothes and explaining that "he had messed up and that Jennifer was gone." Shortly thereafter, petitioner gave a full written confession that was consistent with the evidence discovered at the crime scene. He accurately described the victim's death and the type of gun used to kill her. He also gave an account of the struggle preceding the murder that was consistent with the victim's injuries. Finally, petitioner's statement indicated that he was aware

---

[1] The victim's parents worked at night and were not home at the time of the murder.

of precisely how the victim's body was found.

Petitioner's inculpatory statements were far from the only evidence of his guilt. Additionally: (i) the victim's jewelry was found under the cash register at the comic book store where petitioner worked; (ii) police discovered the victim's blood on both the soles and *tops* of petitioner's shoes; and (iii) the gun used to kill the victim, her wallet, and petitioner's bloody clothing were discovered in the knapsack that Tung had lent petitioner and which was still in his possession when he had left the hotel on the night of the murder. Lastly, in a double reverse, petitioner's testimony at trial was mostly consistent with the implausible account that he had originally given to police before confessing. Indeed, petitioner's false explanations were so completely implausible, that his testimony likely operated to confirm his guilt. Obviously, the jury did not accept petitioner's explanations and it convicted him of second degree murder (N.Y. Penal Law § 125.25(1)), first degree burglary (N.Y. Penal Law § 140.30(2)), and second degree criminal weapon possession (N.Y. Penal Law § 265.03).

Petitioner now moves this Court *pro se* for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. He challenges his conviction on three grounds, each of which was presented to and rejected by the New York State Court of Appeals, People v. Ramos, 99 N.Y.2d 27, 750 N.Y.S.2d 821, 780 N.E.2d 506 (2002). First, he contends that the delay between his arrest and arraignment – during which time he confessed to the murder – violated his constitutional right to counsel. Second, he contends that the trial court denied him due process and the right to present a complete defense when it excluded evidence that his other girlfriend, Tung, had threatened to kill the victim weeks before the murder. Third, he contends that the trial court denied him due

process by allowing the prosecutor to introduce Tung's statement to police regarding his comments to her on the night of the incident. None of the asserted grounds supports habeas relief. Accordingly, the petition for a writ of habeas corpus is denied.

**DISCUSSION**

I.  *Delayed Arraignment Claim*

Petitioner came to the police station on the same day of the murder, July 18, 1996. He arrived at 7:30 p.m. Police offered him food and drink. They then placed him in an interview room, alone and unrestrained. At approximately 10:00 p.m., petitioner was read his Miranda rights, and he signed a form confirming that he understood those rights and did not want an attorney present during questioning. Petitioner then gave his first statement during an interview which concluded at approximately midnight, twenty minutes before his arrest. He then spent the night at the police station, and at approximately 1:00 p.m. the next day, he faced renewed questioning from another detective, who confronted him with adverse evidence. Following disclosure to him of the inculpatory evidence, petitioner confessed. The interview was completed at approximately 3:30 p.m., and shortly thereafter, petitioner was arraigned – approximately 15 hours after he had been arrested and 24 hours after he had been taken voluntarily to the police station.

Petitioner's delayed arraignment claim was addressed in depth by New York's highest court. Ramos, 99 N.Y.2d at 32-37. That court determined that petitioner had not raised a constitutional claim, but instead a claim based on a state statute, which provides:

> Upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting

> and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without unnecessary delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question.

N.Y. C.P.L. § 140.20(1). This New York statute mirrors Rule 5(a) of the Federal Rules of Criminal Procedure:

> A person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge . . . .

Fed. R. Crim. P. 5(a). Confessions obtained in violation of the federal rule against unreasonable pre-arraignment delay are inadmissible at a federal trial. McNabb v. United States, 318 U.S. 332, 344-47, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Mallory v. United States, 354 U.S. 449, 455-56, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). However, the McNabb-Mallory exclusionary rule is not constitutional in nature, and accordingly, not binding on the states. Gallegos v. Nebraska, 342 U.S. 55, 63-64, 72 S.Ct. 141, 96 L.Ed. 86 (1951); Holmes v. Scully, 706 F. Supp. 195, 202 n.7 (E.D.N.Y. 1989); Ramos, 99 N.Y.2d at 36 n.9. Since the claim is not constitutional, it cannot, on its own, be the basis of a habeas claim. Holmes, 706 F. Supp. at 202 ("[D]elay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion."); see generally Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). At best, a delay in arraignment may be one factor that a court considers when determining whether a confession was voluntary for purposes of the Fifth Amendment. Holmes, 706 F. Supp. at 202. Accordingly, petitioner's claim, to the extent

that it is based solely upon a delay in his arraignment, is not cognizable, as it does not implicate any constitutional right.

The New York State Court of Appeals, moreover, could not have been clearer that petitioner did not raise a constitutional claim. In addressing the delayed arraignment claim, it held that "defendant's claim involves only an asserted violation of CPL 140.20, not the State constitutional right to counsel," Ramos, 99 N.Y.2d at 32, and further that "[d]efendant makes no claim under the Sixth Amendment to the United States Constitution and cites no federal cases in support of his claim." Id. at 33 n.4. Petitioner never raised a Fourth or Fifth Amendment claim to the Court of Appeals, nor did he raise additional facts suggesting that his confession may have been involuntary. Id. at 36 n.9 ("[T]he appeal before us does not involve the voluntariness of a confession.").

A petitioner seeking habeas relief must first "exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (internal quotation marks omitted). To satisfy this requirement, "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Id. (quoting Duncan v. Henry, 513 U.S. 364, 365-66, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam)). To the extent that petitioner's pre-arraignment delay claim here is based upon any provision of the federal constitution, it still fails, as no such claim was ever "fairly presented" to the New York State Court of Appeals.

Despite petitioner's failure to exhaust claims in state court, these claims are nonetheless exhausted in a practical sense because petitioner can no longer raise them in state court due to clearly established state procedural rules. Thus, for purposes of a habeas petition, the claims are deemed exhausted but procedurally barred.[2] See Harris v. Reed, 489 U.S. 255, 263 n.9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); Grey v. Hoke, 933 F.2d 117, 120-21 (2d Cir. 1991). Since all constitutional claims suggested by petitioner's motion are barred from state court review by an independent and adequate state ground – specifically, the state court rule that an appellant gets one shot at raising his claims on direct appeal – review by this Court on the merits is precluded unless the petitioner can demonstrate both cause and actual prejudice or, alternatively, that failure to consider the claim will result in a fundamental miscarriage of justice, *i.e.*, petitioner may be "actually innocent." Brown v. Greiner, 409 F.3d 523, 532 (2d Cir. 2005). Petitioner has not attempted to demonstrate cause, prejudice, or a fundamental miscarriage of justice.[3] Additionally, given the overwhelming weight of evidence against petitioner, the Court cannot comprehend a basis upon which one could even argue prejudice or actual innocence.

II.     *Evidentiary Claim Regarding Exclusion of Statement Implicating a Third-Party*

---

[2] Petitioner's N.Y. C.P.L. § 140.20(1) claim was also found to be procedurally barred by the New York Court of Appeals because petitioner had never raised the claim to the trial court. Ramos, 99 N.Y.2d at 37. Regardless, the delay of petitioner's arraignment did not even reach the 24 hour threshold that, under New York law, would give rise to a presumption of unnecessary delay. See People ex rel. Maxian ex rel. Roundtree v. Brown, 77 N.Y.2d 422, 426, 568 N.Y.S.2d 575, 570 N.E.2d 223 (1991) (per curiam).

[3] Though the ineffective assistance of trial or appellate counsel can constitute cause, Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), such a claim may not be considered by a habeas court unless an independent Sixth Amendment claim was previously raised and exhausted in state court. See Edwards v. Carpenter, 529 U.S. 446, 451-53, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000). It matters not that the petitioner raises the ineffective assistance claim only to establish cause for procedurally defaulting an unrelated constitutional claim. Id.. In any event, petitioner has not raised an ineffective assistance of counsel claim to this or any court.

Faced with overwhelming evidence against him at trial, petitioner attempted to advance a theory that his 16 year-old girlfriend, Pao Tung, was actually responsible for the murder, as she had previously expressed jealousy that petitioner may also have been dating the victim. Petitioner established that Tung: (i) dated a boy affiliated with the "Flying Dragons" gang and thus might have had a gang connection; (ii) had psychological issues; (iii) had a black belt in karate and thus may have had the physical strength to inflict the injuries that the victim sustained; and (iv) was sighted by two witnesses – one of whom lived with petitioner – in the hours before the murder buying a lily, like one that was found at the murder scene.[4]

Petitioner contends, as he did in state court, that he was denied his constitutional right to present a complete defense by the trial court's exclusion of testimony that petitioner's cousin had heard Tung threaten the victim weeks before the crime. Petitioner contends that the trial court incorrectly evaluated the admissibility of this evidence under a state evidentiary rule that was subsequently repudiated in People v. Primo, 96 N.Y.2d 351, 728 N.Y.S.2d 735, 753 N.E.2d 164 (2001). At trial, an evidentiary hearing was held to address this issue, and petitioner's 15 year-old cousin relayed the substance of his testimony, specifically that he had heard Tung say to the victim, weeks before the murder, that "if I ever see you around [my boyfriend], I'm gonna kill you." After the evidentiary hearing, the trial court excluded this testimony based on the "clear link" test, which requires that "[t]he evidence introduced . . . do more than raise a mere suspicion that it was a different person that committed the crime. There must be a clear link that establishes

---

[4] In his confession to police, petitioner admitted that he had brought the lily to the victim. His theory that Tung committed the murder, nevertheless, included the argument that the lily could have been Tung's signature or calling card, as she had before used the name "Tiger Lily."

8

that it was another that committed the crime." People v. Aulet, 111 A.D.2d 822, 825, 490 N.Y.S.2d 567 (2d Dep't 1985).

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214, 1219 (1996) ("AEDPA"), a writ of habeas corpus shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[5] 28 U.S.C. § 2254(d)(1); Carey v. Musladin, 549 U.S. ___, 2006 WL 3542769 (Dec. 11, 2006). Here, petitioner's claim was addressed "on the merits" by the New York State Court of Appeals, which concluded that petitioner's "other contentions are without merit." People v. Ramos, 99 N.Y.2d at 37. Such a catch-all phrase is sufficient to constitute an adjudication on the merits for purposes of habeas review. See Harris v. Kuhlmann, 346 F.3d 330, 344 n.8 (2d Cir. 2003).

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court delineated an analytical framework to guide review of habeas claims, identifying the need to treat independently the "contrary to", and "unreasonable application" clauses of Section 2254(d)(1). With respect to the "contrary to" clause, a writ may issue if the state-court decision "contradicts the governing law set forth in [Supreme Court] cases" or arrives at a different conclusion from the Supreme Court on "materially indistinguishable" facts. Id. at 405-

---

[5] A writ of habeas corpus may also issue if the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determination of factual issues is presumed correct unless the petitioner can demonstrate otherwise by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Here, petitioner does not contend that the state court's adjudication was based on an unreasonable factual determination, and thus the Court analyzes petitioner's claims solely under 28 U.S.C. § 2254(d)(1).

06. With respect to the "unreasonable application" clause, a writ may issue if the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry, however, is limited, and the habeas court may only issue a writ where the state court's application of Supreme Court precedent was "objectively unreasonable." Id. at 409. "Some increment of incorrectness beyond error is required" for a decision to be considered objectively unreasonable, though the increment need not be great. Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000).

The Supreme Court has recognized the right to present a defense as "one of the 'minimum essentials of a fair trial.'" Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988) (quoting Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). This right is nonetheless limited and a criminal defendant is subject to rules of evidence so long as those rules serve "'legitimate interests in the criminal trial process,' . . . and are not 'arbitrary or disproportionate to the purposes they are designed to serve.'" United States v. Almonte, 956 F.2d 27, 30 (2d Cir. 1992) (quoting Rock v. Arkansas, 483 U.S. 44, 55-56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)). In this vein, the Second Circuit has noted that the Supreme Court has drawn a distinction between a state's blanket evidentiary prohibitions that may be overbroad, and a state trial court's ordinary evidentiary rulings upon which the Supreme Court has been reluctant to impose restraints. Wade v. Mantello, 333 F.3d 51, 60 (2d Cir. 2003); see also Crane v. Kentucky, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). In Crane v. Kentucky, the Supreme Court noted that the "Constitution leaves to the judges who must make these decisions

'wide latitude' to exclude evidence that is 'repetitive ⋯, only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" 476 U.S. at 689 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (alterations in original).

The propriety of the state court's evidentiary ruling is, according to a recent Second Circuit case, the first issue that a reviewing court must address. Wade, 333 F.3d at 59. In line with Wade, the habeas court's review is initially limited to assessing the objective reasonableness of a state appellate court's decision affirming the propriety of the trial court's evidentiary ruling. Id. at 59-60. Only upon finding some error in this decision should the habeas court move on to considering the materiality of the excluded evidence. Id. at 59-60. Wade hints that habeas courts will rarely need to reach the latter issue of materiality given the wide latitude that Supreme Court precedent affords state trial courts when it comes to ordinary evidentiary rulings. See id. at 60. If the habeas court does find error in the exclusion of evidence, it is still nonetheless the excluded evidence's materiality that will determine whether the trial court's error was one of constitutional magnitude, *i.e.*, one that deprived the petitioner of a fundamentally fair trial. Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). In explaining how the excluded evidence's materiality relates to the standard for constitutional error, the Supreme Court has stated:

> The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. *It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there

> is no justification for a new trial. On the other hand, if the verdict is
> already of questionable validity, additional evidence of relatively
> minor importance might be sufficient to create a reasonable doubt.

United States v. Agurs, 427 U.S. 97, 112-13, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In People v. Primo, the New York State Court of Appeals noted that the "clear link" test, which the trial court applied in petitioner's case, was essentially a shorthand for what courts should be doing when deciding whether to admit evidence of third-party culpability – weighing the evidence's probative value against the risks of delay, undue prejudice, and jury confusion. 96 N.Y.2d at 356. However, the court concluded that it was best to abandon the "clear link" phraseology, because the phrase suggested that evidence of third-party culpability – which is presented by a criminal defendant who has a constitutional right to present a meaningful defense – "occupies a special or exotic category of proof." Id. Furthermore, the Court of Appeals directed lower courts to more explicitly base their conclusions on conventional evidentiary principles, *i.e.*, a general balancing of *both* the evidence's probative value and countervailing risks. Id. at 356-57. The Court of Appeals never held, however, that the "clear link" test was constitutionally infirm. Previously, in Sparman v. Edwards, 26 F. Supp. 2d 450 (E.D.N.Y. 1997), Judge Gleeson had questioned the test's constitutionality, but determined that a habeas court was limited to determining whether the test's application had led to an unconstitutional result. Id. at 472-73; see also Wade, 333 F.3d at 62 ("We doubt, although we have no occasion to decide it here, whether categorically requiring evidence of third-party culpability to meet a heightened showing of probity comports with the constitutional guarantee of the right to present a complete defense.").

12

In this case, the trial court determined that the testimony of petitioner's cousin did not satisfy the "clear link" test. A review of the transcript reveals that the trial court determined that the probative value of that testimony was insufficient to warrant admission. The testimony would have, at most, established a single threat of a type which is, unfortunately, common amongst teenagers and often not meant literally. The trial court apparently concluded that a teenaged girl saying "I'll kill you" to a romantic rival in a crowded pizzeria was trivial, commonplace, insignificant, and could not prove that she did, in fact, commit murder. This Court agrees that the probative value of the proffered evidence would be, at most, exceedingly weak. A trial judge may exclude such "marginally relevant" evidence to avoid any countervailing risks of admission.

Somewhat problematic, however, was the trial judge's failure to articulate the countervailing risks of admission, while apparently relying on a state court evidentiary rule that has raised serious constitutional doubts. Still, given the very tenuous nature of the evidence, this Court cannot say that the decision to exclude the statement was arbitrary or out of line with traditional evidentiary principles. Even a minimal finding of potential delay, prejudice, or juror confusion would have sufficed to justify the exclusion. The affirmance of the trial court by New York's highest court was, therefore, not objectively unreasonable, especially given the Supreme Court's instruction that habeas courts are to give considerable deference to such ordinary evidentiary rulings. Furthermore, even if this Court were to find error, the exceedingly weak probative value of the proffered evidence, in the face of overwhelming evidence against the defendant and scant evidence implicating his 16 year-old girlfriend, compels the conclusion that,

13

if erroneous, the exclusion of this evidence was not so material as to deprive petitioner of a fundamentally fair trial. For these reasons, the Court rejects petitioner's second claim.

III. *Evidentiary Claim Regarding Introduction of Inculpatory Statement*

Petitioner lastly claims that the trial court improperly admitted, through the testimony of a police detective, a statement of petitioner's girlfriend, Pao Tung, which indicated that: (i) petitioner had shown up at Tung's house at 4:30 a.m. on the night of the murder; (ii) that he asked her for a change of clothes; and (iii) that he had told her that "he had messed up and that Jennifer was gone." Petitioner argues that the probative value of this evidence was outweighed by its potential prejudice, and also that it permitted the jury to draw an inference of guilt from his post-arrest silence, therefore violating his constitutional rights. This claim is completely meritless.

The proffered statement was unquestionably relevant, as it was offered by the prosecution to show petitioner's state of mind upon being confronted with such inculpatory evidence contradicting his original story, and to explain why petitioner had changed his story and ultimately confessed to murder: his girlfriend had inculpated him, and his previous statement had been exposed as a lie. The objected to evidence was offered to dispel the defense argument that petitioner's confession may have resulted from police abuses. Contrary to petitioner's contention, the statement was not admitted to explain and draw attention to his immediate reaction of silence.[6] Most importantly, when the trial court admitted the evidence, it gave an

---

[6] The trial transcript reveals that this aspect of the claim, implicating petitioner's Fifth Amendment privilege against self-incrimination, was never raised to the trial court when the admissibility of this evidence was being considered.

14

appropriate limiting instruction.

As an initial matter, the prosecutor did not offer the statement for its truth, and since the trial court gave the jury a limiting instruction not to consider it for anything other than its impact on petitioner's state of mind, a reviewing court is to presume that the jury heeded the trial court's instruction. See United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002). Furthermore, petitioner's cry of prejudice is eviscerated by the fact that defense counsel had previously elicited the substance of Tung's statement while cross-examining her. Only after this cross-examination did the prosecution offer the detective's testimony about confronting petitioner with Tung's statement. Given that the substance of the allegedly prejudicial statement had already been admitted independently at trial by petitioner's own doing, the probative value of the statement clearly outweighed any potential prejudice that would have resulted from its admission. But, even absent the independent admission of Tung's statement by petitioner, this Court would still come to the same conclusion on balance of the record presented.

In a nutshell, this Court finds no infirmity in the trial court's evidentiary ruling. The prosecution's use of the statement was appropriate and to be expected once petitioner raised claims that his confession was the product of police wrongdoing. Moreover, since the claim was presented to the New York State Court of Appeals, which rejected it "on the merits," petitioner would not be entitled to habeas relief unless this Court found the state court's determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). There is absolutely no basis in the record for such a finding.

## CONCLUSION

For the foregoing reasons, the petition of Hilberto Ramos for a writ of habeas corpus is denied. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(2).

**SO ORDERED.**

Dated: Brooklyn, New York
December 11, 2006

ERIC N. VITALIANO
United States District Judge